[817 NYS2d 71]

In the Matter of HARRY BRIFFEL et al., Appellants, v COUNTY OF NASSAU et al., Respondents.

Second Department, May 30, 2006

---

**APPEARANCES OF COUNSEL**

*Harry Issler, PLLC*, New York City (*Daniel J. Dillon* of counsel), for appellants.

*Lorna B. Goodman, County Attorney*, Mineola (*Dennis J. Saffran* and *David B. Goldin* of counsel), for respondents.

**OPINION OF THE COURT**

FLORIO, J.P.

This matter involves a challenge to the assessments imposed by the respondents, County of Nassau, Board of Assessors of Nassau County, and Nassau County Assessment Review Commission (hereinafter collectively the County), upon certain parcels of class one real property located throughout the county of Nassau. The class one real property involved in this proceeding was assessed, as required by RPTL 305, at a uniform percentage of value (i.e., the fractional assessment rate) (*see* RPTL 305 [2]). Then, as is also required, the full value, as well as the assessed value and the fractional assessment rate of each parcel, was recorded on the County's assessment roll (*see* RPTL 502 [1]-[3]). These assessments are subject to a cap on increases as set out in RPTL 1805 (1), which limits any increases in the assessed value to, inter alia, no more than 6% above that of the previous year *"as measured from the assessment on the previous year's assessment roll"* (emphasis added [hereinafter the cap]).[1]

---

**1.** The section also limits increases in assessed value to 20% in any five year period, but that limitation is not at issue here. Insofar as is relevant, RPTL 1805 reads:

> "Limitation on increases of *assessed value* of individual parcels
>
> "1. The assessor of any special assessing unit shall not increase the *assessment* of any individual parcel classified in class one in any one year, as measured from the *assessment* on the previous year's assessment roll, by more than six percent and shall not

It places no limits on changes in the fractional assessment rate, which is set by the assessing unit, nor does it limit the ultimate tax to be imposed.

For the tax year commencing January 1, 2002 (hereinafter the 2002 tax year), the fractional assessment rate was set by the County at 2.11%, while for the tax year commencing January 1, 2003 (hereinafter the 2003 tax year), it was set at 1%. The change in the fractional assessment rate has allowed the full market value of the petitioners' properties to rise more than 6% while the assessed value of the properties as shown on the County's tax rolls has not risen correspondingly. The petitioners claim that allowing this type of manipulation will eviscerate the protective effect the enactment of the cap was intended to provide. Thus, the cap was violated and the assessed values should be adjusted downwards, thereby providing that protection. We disagree.

The problem arose because the County historically has determined the full market value of residential properties, such as the class one real property at issue here, based on 1938 construction costs and 1964 land values. As a result of the settlement in *Coleman v County of Nassau* (Nassau County Index No. 30380/97), the County agreed to revalue residential properties at their actual full market value as of the date the assessor evaluated them.[2] After the revaluation, a new assessed value was determined by multiplying the new full market value by the new fractional assessment rate set by the County. The parties' taxes were then computed based on that new assessed value. It also appears that the new full market values were used for the first time in the tax year commencing January 1, 2003.

The petitioners contend that the term "assessment" as defined in RPTL 102 (2) and used in RPTL 1805 (1) means the full market value of the property. Since in the case of most of the petitioners' properties, that value has increased by much more than 6% from tax year 2002 to tax year 2003, they argue that the cap has been violated. In the alternative, the petitioners contend that in determining whether or not the cap was violated, to carry out the Legislature's intent in enacting this statute, the court should have first determined what the assessed value would have been had the fractional assessment

increase such *assessment* by more than twenty percent in any five-year period" (emphasis added).

**2.** The factual background to this matter is most eloquently set out in the dissenting opinion at pages 87 through 89.

rate not changed. Then, if that figure is more than 6% higher than the previous year's figure it should have found that the cap has been violated.

The petitioners do not dispute that in 2003, the tax year in question, the actual assessed value of their properties[3] as shown on the assessment roll did not increase by more than 6% from the previous year and in some cases actually went down. They observe, however, that when combined with the reevaluation following *Coleman*, changes in the tax rate, and changes in the fractional assessment rate, the actual property taxes imposed on many properties rose considerably. They argue that this is contrary to the Legislature's intent in enacting RPTL 1805, which was to establish a policy of real property assessment and taxation which provides stability and protection against economic dislocation for homeowners. For the reasons set forth herein we find that the petitioners' contentions should be rejected.

Contrary to the petitioners' contention, there is no statutory or decisional authority to support their position that the term "assessment," as defined in RPTL 102 (2), is the value, i.e., the full market value, of the property. Insofar as is relevant, RPTL 102 (2) defines assessment as "a determination made by assessors of . . . the *valuation* of real property" (emphasis added) not the full market value of the property. In other places, when the term full value or full market value is used in the RPTL (*see e.g.* RPTL 305, 502 [3]) it juxtaposes that to the terms "assessed valuation" or "total assessed valuation." Were the petitioners correct, there would be no need to use all of these terms. The statute could have used only full market value.

Moreover, RPTL 502 (3) uses the terms "total assessed valuation" and "total assessment" interchangeably. It provides, inter alia, that the *assessment roll* shall have separate columns for the *assessed valuation* of the unimproved land, the *total assessed valuation* of the property, and the *full value* of the property. However, it provides that only the *total assessment* is subject to judicial review pursuant to RPTL article 7, clearly excluding "full value" (or its "cousin" "full market value") from coming within the definition of assessed valuation or assessment.

RPTL 701, the defining statute for tax certiorari proceedings, uses the terms "assessed valuation" or "assessed value," and

---

3. Full market value times the fractional assessment rate.

also juxtaposes those terms with the term "full value." Thus, at least insofar as the RPTL is concerned, the Legislature appears to have equated and used the term "total assessment" almost interchangeably with the term "assessed valuation" in the statutory review scheme. Were the petitioners' contention to be accepted, there would be no need for the separate entries required by RPTL 502 (3). The dissenting Justices also reject the interchangeable use of assessment and assessed value, but they do not appear to give a clear answer as to how they interpret these terms.

Finally, case law also clearly distinguishes between an assessment or assessed value on the one hand, and the full market value or full value of the property on the other (see City of New York v New York State Div. of Hous. & Community Renewal, 97 NY2d 216, 220 [2001]; 41 Kew Gardens Rd. Assoc. v Tyburski, 70 NY2d 325, 330 [1987]; Matter of Hellerstein v Assessor of Town of Islip, 37 NY2d 1, 13 [1975]).

There is also no basis to conclude, as the petitioners argue alternatively, that any determination as to whether or not the cap was violated must be based on a comparison of the assessed values of both this and the previous years as determined by the same fractional assessment rate. There is no such requirement anywhere in the RPTL. The plain language of RPTL 1805 requires only the comparison of the assessed values as they are set out in both the current and prior years' assessment rolls. To do what the petitioners request would require us to add language not in the statute.

Moreover, it is undisputed that the assessed values of many of the petitioners' properties for the 2003 tax year were actually lower than assessed values for the 2002 tax year, and those assessed values which did increase did not exceed the statutory limit. Rather, to effectuate equality in taxation among class one real property, the County employed a methodology whereby it increased the full market value of many parcels, reduced the fractional assessment rate applied to those properties, and then utilized a tax rate which often resulted in higher tax bills for those property owners whose full market value changed drastically as a result of the revaluation consented to in Coleman. Clearly, this is permitted under RPTL 1805, which limits only the increase in assessed value as measured from the assessed value shown on the prior year's assessment roll.

Thus, RPTL 1805 (1) does not require the County to limit, in any way, increases in the full market valuation of the petition-

ers' respective properties and/or to require any comparison based on the previous year's fractional assessment rate. Accordingly, the petitioners failed to establish their clear right to the relief requested and the proceeding was properly dismissed (*see* CPLR 7803 [1]; *Matter of Marino v McGann*, 232 AD2d 641 [1996]; *see generally Matter of Brusco v Braun*, 84 NY2d 674, 679 [1994]; *Spring Realty Co. v New York City Loft Bd.*, 69 NY2d 657, 659 [1986]).

I disagree with the analysis employed by the dissenting Justices, and their proposed solution based on that analysis. Their proposed solution, the same solution proposed by the petitioners, has no basis in the statute.

More importantly, the main thrust of the dissenting Justices' argument appears to be that merely following and complying with the plain language of the statute, while not adding anything to it (the effect of the solution proposed by the dissenting Justices), would frustrate the clear purpose of the statute. I disagree. One or more legislators may have expressed the viewpoint that RPTL 1805 was enacted so as to provide property owners with stability and protection from economic dislocation (*see* dissenting op of Spolzino, J., at 94). However, that is not what RPTL 1805 (1), as enacted over Governor Hugh Carey's veto, does.

The Legislature was aware that there were doubts as to whether this legislation would accomplish this purpose. Governor Carey, in his veto memorandum of November 11, 1981, warned that the bill (including RPTL 1805) would "not meet the standards of fairness to which our taxpayers are entitled" (Governor's Mem vetoing NY Senate Bill S 7000-A, Bill Jacket, L 1981, ch 1057). By enacting RPTL 1805 over this veto, it must be assumed that the legislators recognized the potential problems inherent in the statutory language but ignored them.

This conclusion is borne out by the very text of RPTL 1805, which is entitled "Limitation on increases of *assessed value* of individual parcels" (emphasis supplied) and which thereafter discusses the imposition of such limits on "assessments." As noted above, RPTL 502 (3) also uses the terms assessments and assessed valuations interchangeably.

The language of the statute is plain and unambiguous. It caps only year-to-year increases in assessed value, not increases in the resultant tax burden. The plain language of the statute allows the manipulation of the assessed value by changing the fractional assessment rate, as the dissent complains. Had the

Legislature wished to prevent this, it could have used the term full value throughout the RPTL. The failure to do so is further proof that it was aware that this could happen and is allowing it.

In seeking to limit tax increases to some Nassau County property owners, the dissenting Justices attempt to import a possible ambiguity in RPTL 1805 (1) by elevating a single legislative memorandum, expressing concern over dramatic tax increases, to the exalted status of "[t]he obvious purpose" of the statute (dissenting op of Spolzino, J., at 94). The dissenting Justices' interpretation of the statute can only be reached by disregarding its clear language in favor of a legislative memorandum which purportedly underlies it. Such an approach is contrary to established principles of statutory construction, which require us to interpret statutes according to their plain and unambiguous language as written, and without regard to expressions of hope or understanding that may be at odds with those express terms (*see Leader v Maroney, Ponzini & Spencer*, 97 NY2d 95, 104 [2001]; *Matter of Heller*, 23 AD3d 61, 66-67 [2005]).

The Legislature easily could have drafted RPTL 1805 (1) to limit increases not only for the assessed values, but also for the ultimate tax liability of property owners, had it intended to do so. In RPTL 1803-a, enacted in the same bill as amended RPTL 1805, the Legislature used the terms taxable assessed value and market value separately. Moreover, in RPTL 1803-a (2) (a) (1) the statute instructs us how to determine the market value from the taxable assessed value.

Thus, it is clear that the Legislature was aware of the interplay between assessed value, market value, and the ultimate tax to be paid by property owners. Had it so desired, it could have prohibited the type of manipulation that the petitioners and the dissenting Justices find so objectionable in this case. It elected not to do so. For the courts to now engraft such a limitation onto RPTL 1805 (1) by judicial fiat would impermissibly rewrite a clearly worded statute to obtain a desired result (*see Desiderio v Ochs*, 100 NY2d 159, 169 [2003]; *see also People v LaValle*, 3 NY3d 88, 131 [2004]; *cf. Brothers v Florence*, 95 NY2d 290, 298-301 [2000]). This cannot be done with a clear conscience, no matter how distasteful that result might be.

The court providently exercised its discretion in denying the petitioners' motion for recusal (*see Matter of Borrell v Hanophy*, 246 AD2d 647 [1998]; *Berman v Herbert Color Lithographers Corp.*, 222 AD2d 640 [1995]).

The petitioners' remaining contentions are without merit.

The appeal from the intermediate order must be dismissed because an order made in a CPLR article 78 proceeding is not appealable as of right (see CPLR 5701 [b] [1]), and, in any event, the right of direct appeal therefrom terminated with the entry of judgment in the proceeding (see Matter of Aho, 39 NY2d 241, 248 [1976]). The issues raised on appeal from the order are brought up for review and have been considered on the appeal from the order and judgment (see CPLR 5501 [a] [1]).

KRAUSMAN and MASTRO, JJ., concur, with FLORIO, J.P.; SPOLZINO, J., dissents in part in a separate opinion, and LIFSON, J., dissents in part in a separate opinion.

SPOLZINO, J., dissents in part and votes to dismiss the appeal from the order, reverse the order and judgment, grant the motion for summary judgment, deny the cross motion to dismiss the proceeding, grant the petition to the extent that the matter is remitted to the Supreme Court, Nassau County, for the entry of a judgment directing the respondents to reduce those assessments that fail to comply with RPTL 1805 (1), and otherwise deny the petition with the following memorandum:

This appeal presents a narrow issue under the Real Property Tax Law: May the County of Nassau vary the percentage of fair market value at which it assesses real property to avoid complying with the legislative mandate that taxpayers be protected from sudden and dramatic assessment increases? Although technically complex, the issue is fundamentally simple. Because the County's action was intended to, and did, effectively substitute the County's judgment for that of the New York State Legislature with respect to the manner in which the impact of the reassessment should be shared among taxpayers, I would reverse the order and judgment appealed from and grant the petition to the extent of remitting the matter to the Supreme Court, Nassau County, for the entry of a judgment directing the County of Nassau, the Board of Assessors of Nassau County, and the Nassau County Assessment Review Commission (hereinafter together the County) to reduce those assessments that fail to comply with the statutory mandate. Accordingly, I respectfully dissent, in part.

Preliminarily, I concur that the appeal from the intermediate order must be dismissed because an order made in a proceeding pursuant to CPLR article 78 is not appealable as of right (see CPLR 5701 [b] [1]) and, in any event, the right of direct appeal therefrom terminated with the entry of final judgment in the

proceeding (*see Matter of Aho*, 39 NY2d 241, 248 [1976]). The issues raised on appeal from the order, however, were properly brought up for review and have been properly considered on the appeal from the order and judgment (*see* CPLR 5501 [a] [1]).

I also concur that the Supreme Court providently exercised its discretion in denying the petitioners' motion for recusal. Absent a legal disqualification under Judiciary Law § 14, which is not at issue here, a judge is the sole arbiter of recusal, and his or her decision in that regard will not be overturned absent an abuse of discretion (*see People v Moreno*, 70 NY2d 403, 405-406 [1987]). Recusal, as a matter of due process, is required only when the judge has a direct, personal, substantial, or pecuniary interest in reaching a particular conclusion (*see Tumey v Ohio*, 273 US 510, 523 [1927]), or where a conflict in judicial roles is seen to exist (*see In re Murchison*, 349 US 133, 137 [1955]). "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible" (*Liteky v United States*, 510 US 540, 555 [1994]). Since the petitioners did not raise any such arguments in support of their recusal motion, the Supreme Court acted within the proper bounds of its discretion in denying the motion.

I differ with my colleagues' conclusion, however, with respect to the substantive issue here. That issue concerns the impact of section 1805 of the Real Property Tax Law on Nassau County's reassessment for the tax year commencing January 1, 2003. RPTL 1805 (1) provides, in pertinent part, as follows:

> "The assessor of any special assessing unit shall not increase the assessment of any individual parcel classified in class one in any one year, as measured from the assessment on the previous year's assessment roll, by more than six percent and shall not increase such assessment by more than twenty percent in any five-year period."

A special assessing unit is defined as "an assessing unit with a population of one million or more" (RPTL 1801 [a]). The County is a "special assessing unit"; the only other "special assessing unit" is New York City. "Class one" property includes residential properties such as those in issue here (RPTL 1802 [1]).

The petitioners in this and the related proceedings (*see Matter of Minkoff v County of Nassau*, 29 AD3d 1000 [2006] [decided

herewith]; *Matter of O'Shea v Board of Assessors of Nassau County,* 29 AD3d 1002 [2006] [decided herewith]) assert that in establishing the assessed values for their properties for the 2003 tax year, the County violated the cap imposed by RPTL 1805. The County, relying upon a tax roll reflecting that the assessed values of the petitioners' parcels were not increased by more than 6% over the assessed values set forth in the tax roll for the previous year, denies that it has acted improperly and claims that, in actuality, the assessed value of the petitioners' properties have decreased. This dispute is not as simple as the County would have it, however, and, in my view, can be understood properly only against the background of the manner in which the County has addressed the need to reassess following *Matter of Hellerstein v Assessor of Town of Islip* (37 NY2d 1 [1975]), and the revolution in assessment practices that it spawned.

In *Hellerstein,* decided in 1975, the Court of Appeals held that the statutory requirement that all real property be assessed at its fair market value, a requirement previously honored by New York's assessors more in the breach than in the observance (*see City of New York v New York State Div. of Hous. & Community Renewal,* 97 NY2d 216, 220 [2001]; *Matter of Hellerstein,* 37 NY2d at 13, *supra*), actually meant what it said, and prohibited the widespread practice of assessing property at a fraction of its value. In response, the Legislature repealed RPTL 306, the statutory provision prescribing full value assessments, and adopted a new provision, RPTL 305, allowing the practice of fractional assessment to continue, as long as the percentage of full value was consistent throughout the assessing unit (L 1981, ch 1057, § 1; *see generally Foss v City of Rochester,* 65 NY2d 247, 251-252 [1985]). In the same legislation, the Legislature divided assessable properties into several classes, and allowed the classes to be assessed at different percentages of full value, provided the percentage of value was consistent within each class (L 1981, ch 1057, § 2). As a result, special assessing units "calculate real property taxes by determining the full value of each parcel, fixing the ratio of full value to assessed value in each class, and, finally, applying a uniform tax rate for each class of property to the assessed value producing the tax due" (*41 Kew Gardens Rd. Assoc. v Tyburski,* 70 NY2d 325, 330 [1987]).

Following *Hellerstein,* the County persisted in applying an apparently unique method of assessment, by using 1964 land

values and 1938 construction costs to determine the fair market value of each parcel of class one real property. That practice was challenged in *Coleman v County of Nassau* (Nassau County Index No. 30380/97), in which the plaintiffs sought a declaration that the assessment practices in Nassau County, as then applied, were, in essence, racially discriminatory and violated federal fair housing laws (*see* 42 USC §§ 2000d, 3601 *et seq.*) because those practices overassessed areas of low income housing, in which racial minorities predominated, and underassessed wealthier areas, in which few racial minorities resided.

In March 2000, without conceding the allegations of the complaint, the County, along with the United States Attorney and the New York State Attorney General, resolved the *Coleman* litigation by entering into a consent decree acknowledging that the assessment practices of the County warranted modification, and setting forth a remedy. The consent decree obligated the County to reassess in a manner "that is fair, nondiscriminatory, scientific and equitable . . . us[ing] fair market value as the basis of valuing" class one real property. Insofar as is particularly relevant here, the consent decree required the County to assess all class one real property "at a uniform percentage of value (fractional assessment) such that the uniform application of such fractional assessment rate does not result in any assessment for any individual parcel of [class one real] property that would require the application of RPTL 1805 to limit any assessment." However, the consent decree permitted some flexibility in reaching this goal, allowing "that if the fractional assessment rate selected results in not more than .5% of the total residential properties being subject to the limitations of RPTL 1805, such rate shall not be considered in violation of this paragraph."

The consent decree thus provided for continued assessment at less than full value, as long as the application of fractional assessments would not result in more than .5% of the total number of residential properties being subject to the limitations of RPTL 1805. Pursuant to the terms of the consent decree, the New York State Office of Real Property Services undertook to monitor compliance with the ratio requirements, and the court was empowered to remedy any noncompliance. The decree was approved by a vote of the County Legislature, and was thereafter implemented by the County.

Although the statutory requirement, imposed by RPTL 1805, that significant assessment increases be phased in, was not directly challenged in the *Coleman* action, it was apparent at

the time, as the consent decree reflects, that adherence to the statutory command would likely frustrate the twin goals of the decree. Because of the wide disparity between fair market value and assessed value in many cases prior to reassessment, it was simply impossible, mathematically, to maintain an assessment roll based directly on fair market value without increasing the assessed value of many parcels by more than the factor permitted by RPTL 1805. Thus, the *Coleman* decree would be neutered by the application of state law unless a means could be found, other than a dramatic increase in assessed values, to raise significantly the share of the tax burden borne by the owners of underassessed properties. As the County recognizes, the manipulation of the fractional assessment rate in issue here was that means.

That the consent decree was structured as it was to avoid the strictures imposed by RPTL 1805 is obvious, as recognized by Justice F. Dana Winslow, the Supreme Court Justice who presided over both the *Coleman* stipulation and this proceeding. In granting the County's motion to dismiss the petition, he observed, in pertinent part, as follows:

> "The consent decree contemplated that some properties would, in fact, fall within the protection of RPTL 1805 (1) as a result of the reappraisal project, and that [RPTL 1805 (1)] would be applied to those properties as required by law. However, since such application of the statutory cap would permit some properties to continue to be under-assessed, the decree obligated the County to keep the percentage of RPTL 1805 protected properties to a minimum (.5%). This obligation did not alter the fundamental requirement that *all* properties be appraised at full market value, but it did provide flexibility for the County to exercise [its] statutory power as a 'special assessing unit' to reduce the percentage which the County applies to 'full market value' of all properties in order to arrive at 'assessed value.' "

Justice Winslow had expressed the same concept more directly in his decision dated March 3, 2003, denying the County's motion for reconsideration of his approval of the 2002 tax roll:

> "Application of this statutory ceiling to under-assessed properties would thus frustrate the very clear purposes of the Reassessment Project . . . [T]he County would have the flexibility needed to

make whatever adjustments might be necessary to avoid the imposition of the RPTL 1805 cap . . . [T]he Decree effectively declares a policy of 'zero tolerance' with respect to properties that would remain under-assessed solely by reason of the RPTL 1805 ceiling."

As Justice Winslow thus recognized, the County could comply with the stipulation, while arguably satisfying the requirements of RPTL 1805, only by changing the fractional assessment rate from one year to the next, so that assessed values would not rise more than the statute permits. That the County did so is indisputable, and is not denied. In 2002, the tax year prior to the entry of the consent decree, the fractional assessment rate was 2.11%. The rate was reduced to 1% for 2003, the tax year in issue here. By applying the fractional assessment rate in such a manner, the assessed values of the properties in question were reduced, but the actual taxes imposed were increased substantially solely as a result of the reassessment, i.e., even in the absence of any increase in the tax rate.

The effect of the County's methodology is easily demonstrated by its impact on the lead petitioners, Harry Briffel and Meyanne Briffel. For their parcel of class one real property, the Briffels' prereevaluation assessed value of $8,010 reflected a full value of $379,621 at the 2.11% fractional assessment rate. The 2003 assessed value of $6,066, at the 1% fractional assessment rate, reflects a full value of $606,600 for that parcel. Had the fractional assessment rate remained constant, the increase in full value would have resulted, without the application of the cap, in an assessed value of $12,799. Assuming the school tax rate did not change from 2002 to 2003,* the Briffels' school taxes in 2003 would have been $7,090, an increase of 62% over the $4,370 that they paid in 2002.

The Briffels do not present the most dramatic example of this impact. The petitioner James Monroe saw his 2002 assessed value of $1,500 increase to $3,070 for 2003. Performing the same arithmetic, his full-value assessment for 2003 of $307,000, at the 2.11% fractional assessment rate, would have resulted in

---

* These calculations do not reflect the change in the tax rate that occurred from 2002 to 2003. Since that tax rate is a function of the financial needs of the taxing district as related to the entire tax base (*see Foss v City of Rochester, supra*), rather than the manner in which any individual assessment is determined, the only way to isolate the impact of the County's decision not to apply the statutory cap on assessment increases is to assume for purposes of the comparison that the tax rate remained constant from year to year.

a 2003 assessed value of $6,478. Applying the 2002 school tax rate to this assessed value, his school tax liability would have been $3,631, a 331% increase over his $841 tax liability for 2002.

The County's argument that it acted within the bounds established by RPTL 1805 is predicated on its reading of the statutory language. According to the County, that section regulates increases in "assessment," by comparing the "assessment," as set forth in the current assessment roll, to the "assessment" on the previous year's assessment roll. Since the only "assessment" reflected on each taxpayer's bill in 1981, when the section was adopted, was the "assessed value" of the parcel, the Legislature could have intended only that the relevant comparison be between the "assessed values" from one year to the next. Read by that measure, the County has complied with RPTL 1805, since here the assessed values did not increase more than 6% and, in fact, decreased over the year in question.

In my view, however, the County's argument begs the question of why, if the Legislature meant the measure of compliance with the requirements of RPTL 1805 to be "assessed value," it employed the term "assessment" in the statute. "When different terms are used in various parts of a statute or rule, it is reasonable to assume that a distinction between them is intended" (*Matter of Albano v Kirby*, 36 NY2d 526, 530 [1975]). There is no legislative history to explain this anomaly, and the section heading upon which my colleagues rely, while of some significance (*see Zajic v Sikora Realty Corp.*, 252 AD 343, 346 [1937]), is not dispositive (*see People ex rel. Arcara v Cloud Books*, 65 NY2d 324, 329 [1985], *revd on other grounds* 478 US 697 [1986]; *People v O'Brien*, 111 NY 1, 59 [1888]; *National Assn. of Ind. Insurers v State of New York*, 207 AD2d 191, 199 [1994], *affd* 89 NY2d 950 [1997]). The term "assessment," moreover, is defined in the RPTL not as "assessed value," but more generically, as "a determination made by assessors of (1) the valuation of real property, including the valuation of exempt real property and (2) whether or not real property is subject to taxation or special ad valorem levies" (RPTL 102 [2]). The absence of any definition of the term "valuation" leaves this line of reasoning ultimately inconclusive.

The County's argument on the basis of the content of tax bills is unconvincing, moreover, because the Legislature chose to define the relevant assessment change not by the content of the tax bill, but based upon what appeared on the assessment

roll. The required content of the assessment roll at the time RPTL 1805 was enacted consisted of a column for "the entry with respect to each separately assessed parcel of the assessed valuation of the land exclusive of any improvements, total assessed valuation and the full value of the parcel" (RPTL 502 [3]). Notably, this provision also fails to describe the content of the roll in terms of "assessment," as would be necessary to the County's argument based on the terminology.

The Legislature did go on to provide, however, that "[o]nly the total *assessment* . . . shall be subject to judicial review provided by article seven of this chapter" (RPTL 502 [3] [emphasis supplied]). The corresponding provision of RPTL article 7 defines "[u]nequal assessment" on the basis of "assessed valuation" (RPTL 701 [8]). While this language would arguably provide a stronger basis for the County's contention, and it would be tempting to resolve the issues presented here in favor of the County on the basis of the apparent equivalence ascribed in these provisions to the terms "assessed valuation" and "assessment," it would be simplistic to do so. The result of the lexicographic analysis urged by the County is the logical equivalent of the reliance placed by the petitioners upon *Matter of New York State Dormitory Auth. v Board of Trustees of Hyde Park Fire & Water Dist.* (86 NY2d 72 [1995]) for the proposition that "assessment" means "value." The issue in that case was whether the Dormitory Authority's exemption from "assessments" included an exemption from "special assessments." Statutory construction, however, turns not on the definition of words disembodied from the context in which they are used, but on an understanding of those words in their context (*see Matter of Livingston*, 121 NY 94, 104 [1890]; *Smith v People*, 47 NY 330, 337 [1872]). Thus considered, the conclusion reached by the Court of Appeals in *Matter of New York State Dormitory Auth. v Board of Trustees of Hyde Park Fire & Water Dist.*, that "assessment" is equivalent to "value" (86 NY2d at 78-79), does not establish that the term "assessment" has the same meaning in the context presented here.

Our role is to read the statute in the manner most consistent with effectuating the Legislature's intent (*see* McKinney's Cons Laws of NY, Book 1, Statutes § 92; *N.Y.A.A.D., Inc. v State of New York*, 1 NY3d 245, 249 [2003]; *Riley v County of Broome*, 95 NY2d 455, 463 [2000]). Of course, "[w]hen the plain language of the statute is precise and unambiguous, it is determinative" (*Matter of Washington Post Co. v New York State Ins. Dept.*, 61

NY2d 557, 565 [1984]), and when the Legislature's intent is thus apparent from the language it has employed, we cannot rewrite the statute (*see Desiderio v Ochs*, 100 NY2d 159, 176 [2003]). Nevertheless, where, as here, the Legislature's intent is not clear solely on the basis of the words it has used, we must construe together statutory terms related to the same subject matter (*see* McKinney's Cons Laws of NY, Book 1, Statutes § 221 [b]; *Khela v Neiger*, 85 NY2d 333, 336 [1995]), so as to make a coherent whole (*see* McKinney's Cons Laws of NY, Book 1, Statutes § 97; *Matter of Pilgrim Psychiatric Ctr. [Christian F.]*, 197 AD2d 204 [1994]), reconciling the apparently conflicting provisions in the manner most consistent with the overall legislative intent (*see* McKinney's Cons Laws of NY, Book 1, Statutes § 98; *Levine v Bornstein*, 4 NY2d 241, 245 [1958]; *People ex rel. Mason v McClave*, 99 NY 83, 89 [1885]), and without rendering any portion of the statute meaningless (*see* McKinney's Cons Laws of NY, Book 1, Statutes §§ 73, 92, 144; *National Org. for Women v Metropolitan Life Ins. Co.*, 131 AD2d 356, 358 [1987]).

Viewed in this light, *Matter of New York State Dormitory Auth. v Board of Trustees of Hyde Park Fire & Water Dist.*, while not dispositive, is instructive. In rejecting the technical construction of the term "assessment" urged by the assessor, Chief Judge Kaye wrote for the Court:

> "If the word 'assessment' in Public Authorities Law § 1685 is to be interpreted in accordance with the definition provided in RPTL 102 (2) to refer to an estimate of property value, the provisions of Public Authorities Law § 1685 are rendered legally meaningless . . . Using the current RPTL definition of 'assessment' to limit Public Authorities Law § 1685 would thus contravene principles of sound statutory construction" (*Matter of New York State Dormitory Auth. v Board of Trustees of Hyde Park Fire & Water Dist., supra* at 78).

The situation presented here is, in my view, no different. The overarching problem with the County's position is that the County's reading of RPTL 1805 would eviscerate the statute. The obvious purpose of the statute was to shield taxpayers from significant, unexpected increases in their tax liability as a result of reassessment. As one memorandum in support of the legislation put it: "The purpose of this bill is the attainment of equitable administration of the real property tax levy by the establishment of a policy of real property assessment and taxation *which provides stability and protection against economic dislocation for homeowners*" (Bill Jacket, L 1981, ch 1057 [emphasis supplied]).

That the County's reading of RPTL 1805 would defeat the intent of that provision is indisputable. The assessed value of a taxpayer's real property has no significance to the taxpayer separate from the amount of tax the taxpayer will be required to pay as a result of that assessed value. Recognizing this fact, it is inconceivable that the Legislature intended RPTL 1805 (1) to restrict the change in the assessed value upon reassessment to 6% but allow the tax liability to double or triple, without a change in the tax rate, solely as a result of the manipulation of the fractional assessment rate. Yet, as the illustrations mentioned above demonstrate, that is exactly the result the County would have us find here to be permitted.

It is no answer to these concerns to assert, as the County does, that its action is consistent with the practices of the City of New York in lowering its fractional assessment rate from 28% to 8% during the period from 1981 to 1993. Since the propriety of the manner in which New York City determines its assessments is not in issue here, there is no record from which it can be determined whether the apparently gradual change in the fractional assessment rate made by New York City's assessors served any legitimate assessing purpose or even implicated RPTL 1805. It certainly was not the result of any agreement on the part of the assessor to act in a manner inconsistent with the requirements of state law, the situation with which we are presented here.

The unstated premise of the County's argument is that the assessor has the unfettered discretion to set the fractional assessment rate. The statutory language appears to support this proposition (*see* RPTL 305 [2]) only if the provisions of RPTL 1805 are ignored. The Legislature, however, has delegated the authority to tax only "within prescribed discretionary limits" (*Foss v City of Rochester, supra* at 253). RPTL 1805 is one of those limits.

Although the impact of the County's action on the actual tax burden of the owners of reassessed property is thus undeniable, I do not, contrary to the characterization of my position by my colleagues, see RPTL 1805 as a limitation on the full-value assessment of the property. RPTL 1805 is, by its terms and as I read it, a limitation only on the assessed value. Obviously, where the fractional assessment rate remains the same from one year to the next, an increase in full value will cause a concomitant increase in assessed value. It is precisely to this calculation that RPTL 1805 speaks, by limiting the increase in assessed value in

such circumstances to a percentage of the prior assessed value, regardless of the increase in the full value of the property. What the County has done is to mask the increase in assessed value that it has imposed on certain properties in excess of that limitation by artificially reducing the assessed value after reassessment through the lower fractional assessment rate.

Similarly, to the extent that my colleagues read this analysis as concluding that RPTL 1805 imposes a limit of 6% on the increase in a property taxpayers' bill, they are mistaken. The actual tax amount that a property owner must pay is a function of both the assessed value and the tax rate. It is obvious from this tax equation that an increase in the assessed value, without a concomitant reduction in the tax rate, will result in a higher tax bill. RPTL 1805, however, has no impact on the tax rate part of the equation.

The County's example of the impact of its tax practices illustrates this very point. The owner of a property with a full value of $100,000 at a 10% fractional assessment rate and 10% tax rate pays $1,000 in tax. If the full value of that property increases to $200,000, the same tax rate, without application of the cap, yields a tax liability of $2,000. The application of the cap would limit the assessed value of that property to $10,600 and the concomitant tax liability to $1,060. In this sense, the application of the cap has affected the tax liability of the property owner in a manner that is clearly intentional. Nevertheless, that limit does not affect the tax rate and the County could, in fact, have achieved its revenue goals without violating RPTL 1805 by raising the tax rate, in this example, to 19%. But in that situation, the goal of RPTL 1805 would nevertheless have been achieved because the taxpayer would not have seen his tax increased dramatically solely by virtue of the reassessment.

Essentially, the County argues that the only value of concern in real property taxation is equality. What the County has done, in the furtherance of that premise, is to determine that it is better to achieve an equal system than it is to protect taxpayers from substantial and unexpected tax increases driven solely by reassessment. Whether or not that is a reasonable resolution of the conflicting concerns at issue here, it is not, as I see it, the resolution reached by the New York State Legislature. The Legislature, while establishing a system of real property taxation in which equality is paramount, has nevertheless decided that, in the limited circumstances to which RPTL 1805 (1) applies, equality must yield to economic stability. In a contest be-

tween the judgment of the New York State Legislature and the judgment of the County of Nassau, the Legislature's judgment always prevails. That judgment can be effectuated here, in my view, only by directing the County to reduce, in accordance with RPTL 1805 (1), the assessed value of each subject property with respect to which the assessed value for the 2003 tax year, determined using a fractional assessment rate of 2.11%, exceeds by more than 6% the assessed value for such property as reflected on the assessment roll for the 2002 tax year, and remitting the matter to the Supreme Court for the entry of an appropriate judgment.

LIFSON, J., dissents in part and votes to dismiss the appeal from the order, reverse the order and judgment, grant the motion for summary judgment, deny the cross motion to dismiss the proceeding, grant the petition to the extent that the matter is remitted to the Supreme Court, Nassau County, for the entry of a judgment directing the respondents to reduce those assessments that fail to comply with RPTL 1805 (1), and otherwise deny the petition, with the following memorandum:

For all the reasons set forth in the dissent of Justice Spolzino, the order and judgment at issue must be reversed. I add the following pertinent observations.

No one disputes the overriding reality which provides the context of the present litigation, to wit, that by utilizing an assessment formula based on 1938 construction costs and 1964 land values, over the passage of time gross disparities have arisen in the assessment of the various residential properties located in the County of Nassau. No matter how couched, the only issue squarely presented to the court is whether the County may apply "a quick fix" to address these inequities, or whether RPTL requires the County to "phase in" such solution within the limitation set forth by RPTL 1805 (1), to wit, 6% per year without exceeding 20% in any five consecutive years.

For the reasons well stated by my dissenting colleague, in which I fully concur, I conclude that to condone the County's machinations would effectively nullify the protection afforded by RPTL 1805 and would destroy any semblance of transparency to the assessment process. At the heart of the present controversy is the alleged manipulation of the fractional assessment rate used.

In the instant case the conceded facts are that the fractional assessment rate employed by the assessing unit was driven *solely*

by the necessity of confining the number of parcels qualifying for RPTL 1805 to an arbitrarily selected figure of .5% of the total parcels in the assessing unit per the stipulation of settlement in *Coleman v County of Nassau* (Nassau County Index No. 30380/97). Such utilization of a fractional assessment rate for other than its intended purpose is not proper (*cf. Matter of Town of Riverhead v New York State Bd. of Real Prop. Servs.*, 5 NY3d 36; *Matter of City of Lackawanna v State Bd. of Equalization & Assessment of State of N.Y.*, 16 NY2d 222 [1965]). If one were to believe that the fractional assessment rate was credible, one would have to believe that the value of real property in Nassau County more than quadrupled in the two years following the initiation of full revaluation. Given that the valuations were based on recent appraisals based on full valuation, such supposition strains credulity.

The Supreme Court's reliance on assessment practices in the City of New York is misplaced. First, the fact that a similar reduction in the fractional assessment rates was employed in the city is not dispositive. The propriety of the City's actions are not now before this Court. The record does not indicate the precise methodology employed and whether the ratio of the total assessment to the total value of the properties within the city approximated the rate utilized. Assuming that the rate was utilized solely to recapture increased values of more highly valued properties, no authority for such misapplication of a fractional assessment rate has been demonstrated. Second and more significantly, the Supreme Court ignored the fact that the City reduced the fractional assessment rate incrementally over a 12-13 year period resulting in a 72% reduction, an average annualized rate reduction of 5.5-5.9% (i.e., within the yearly statutory limits),* compared to back-to-back 50% reductions in the County's fractional assessment rate. I see nothing contained in this analysis or that of Justice Spolzino which would prevent the County from implementing a reassessment based on fair value on a continued incremental basis within the limitations of RPTL 1805. Lastly, I note that the New York City scenario was not a result of any legal proceedings nor otherwise subject to the provisions of a court ordered stipulation. In this case, the very terms of the stipulation require that it be done equitably. It is not equitable to deny any taxpayer the protections of graduated phase-in of reassessment not to exceed 20% in any five-

---

* Whether in any five-year period the reduction exceeded 20% cannot be discerned from the record.

year period afforded to them by their duly elected Legislature. Nor is it equitable to contrive a formula that affords .5% of property owners such protection without any rationale while denying the same protection to the remaining 99.5% of the property owners. Accordingly, based on my view of RPTL 1805, the determination of the Supreme Court under review should be reversed.

Ordered that the appeal from the order is dismissed; and it is further,

Ordered that the order and judgment is affirmed; and it is further,

Ordered that one bill of costs is awarded to the respondents payable by the petitioners.